UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. CR414-078 |
| | ) | |
| ROBERT EVANS and SHERYL D. EVANS, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

The defendants in this Medicare fraud case requested an evidentiary hearing "to determine whether any statements . . . made [to state and federal investigators] during the June 21, 2012 execution of a search warrant [at their home] should be suppressed" as involuntary under *Jackson v. Denno*, 378 U.S. 368 (1964) and 18 U.S.C. § 3501. (Docs. 34 & 41.) Neither defendant, however, asserted that their statements were *in fact* involuntary or that any law enforcement misconduct or overreaching occurred. Defendants' attorneys, in effect, invited the Court to act as an independent inquisitor to determine whether their clients' rights were violated. That is not the Court's role.

While a defendant has both a constitutional and a statutory right to a fair hearing and an independent determination of the voluntariness of his confession prior to its admission at trial, he "is not entitled to this remedy unless he can show 'that his version of the events, if true, would require the conclusion that his confession was involuntary'; *i.e.*, he must allege *facts* which would, if proven true, indicate the involuntariness of his confession." *United States v. Davidson*, 768 F.2d 1266, 1270 (11th Cir. 1985) (emphasis in original) (quoting *Procunier v. Atchley*, 400 U.S. 446, 451 (1971)); *accord United States v. Scheigert*, 809 F.2d 1532, 1533 (11th Cir. 1987) (per curiam); *see United States v. Miller*, 838 F.2d 1530, (11th Cir. 1988) ("facts that do not indicate that a confession could be involuntary *a fortiori* do not entitle a defendant to a hearing on the issue."); *United States v. Mostellar*, 163 F. App'x 831, 835 (11th Cir. 2006). Defendants have baldly asserted that their confessions were involuntary but have failed to set forth *any facts whatsoever* in support of that contention. Defendants' motions should have been denied without a hearing.

The Court nevertheless scheduled an evidentiary hearing, for past

experience has taught that defense counsel are often prepared to flesh out the factual basis for a suppression motion either through an affidavit or testimony from the client at the hearing. No such factual presentation was forthcoming from these attorneys, however. Indeed, while defendant Robert Evans came into the courtroom momentarily (and then departed, never to be seen again), defendant Sheryl Evans never made any appearance at the hearing. Despite the defendants' failure to offer any preliminary factual showing that their statements were involuntary, government counsel did not urge the Court to deny defendants a hearing. For this reason, and perhaps out of an overabundance of caution, the Court proceeded with the hearing. The testimony at that hearing[1] established beyond any doubt that defendants' statements were not the product of any government coercion or overreaching and, therefore, were entirely voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (explaining that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'").

---

[1] The government called 3 witnesses: Special Agent Van Prewitt, Special Investigator James L. Evans, and Special Investigator Ryanne Gillum. The defense called Special Investigator James Bagnall and Special Agent William Klarar. There were no other witnesses.

Special Agent Prewitt, an investigator with the U.S. Department of Health and Human Services, coordinated the execution of several search warrants related to suspected Medicare fraud by Trio Medical Solutions, a durable medical equipment supply company owned and operated by defendant Robert Evans and his co-defendant wife, Sheryl Evans. At around 8 a.m. on June 21, 2012, a search team that included investigators, evidence technicians, and administrative staff arrived at the defendants' home in Pooler, Georgia.[2] Many of the law enforcement personnel were armed with pistols, but their weapons remained holstered throughout the encounter. Agent Prewitt and four or five other agents approached the front door and knocked, while everyone else waited in the driveway. Mr. Evans, who was already clothed and had apparently seen the agents gathering on his property, promptly answered the door. Agent Prewitt explained that he had a federal search warrant for the residence, and Evans then allowed them to enter. While Prewitt explained the search warrant's details to Mr. Evans, the entry team performed a security

---

[2] All of the witnesses agreed that ten or more agents and support staff participated in the residence search. Agent Prewitt recalled a 14-member search team, and the Court accepts that testimony.

4

sweep. When Mrs. Evans, crying and visibly upset, came downstairs in her night clothes, Agent Prewitt again explained the reason for the intrusion and endeavored to calm her down. He assured both defendants that they were not under arrest, that he had no plans to make any arrests, and that they were free to stay or leave while the search proceeded. But, he explained, if they elected to stay they would not be permitted to interfere with the search. Neither defendant was restrained, frisked, or touched by any of the agents.

After the protective sweep, the remainder of the search team entered the house. Agent Prewitt asked Mr. Evans if he was willing to talk about the case. Evans agreed and led Prewitt and two other agents to a sitting room. Special Investigator Ryanne Gillum with the South Carolina Attorney General's office ("SCAG")[3] approached Mrs. Evans and requested an interview. She consented and directed Gillum and FBI Special Agent William Klarer to a separate formal living room for an interview. At some point before the interviews began, the Evanses' twelve-year-old daughter came downstairs and sat on the couch in the

---

[3] South Carolinia law enforcement agents were involved because the majority of the fraudulent Medicare claims were made in that State.

5

living room.  A supervisory agent spent some time reassuring her and helped her make a bowl of cereal for breakfast.

SCAG Investigators James Bagnall and James Evans conducted Mr. Evans' interview.  (Prewitt was often present, but he was sometimes called away to coordinate the rest of the personnel on the scene.)  When Mr. Evans asked whether he should call an attorney, Bagnall stated that he was free to do so if he wished.  Evans elected not to do so and submitted to the agents' questioning.  While he was somewhat nervous, Evans was cooperative and polite throughout the 30 to 45 minute interview.  He exhibited no signs of intoxication and did not appear to suffer from any mental or physical infirmity.  At no point did the agents raise their voices, threaten Evans, make him any promises, or employ any deceptive tactics designed to coerce a confession.[4]  At the end of the interview, the agents asked Evans if he was willing to make a written statement, but he declined to do so.  Afterwards, Evans assisted the

---

[4] Evans' counsel suggested during cross-examination that Mr. Evans was distraught and wanted to take some heart medication to his wife.  Agent Prewitt testified that Evans simply stated that his wife had a heart condition and that he was worried about her and his daughter.  The agents did not recall Evans ever stating that his wife needed any medication, nor is there any evidence that she sought to take any medication before later electing to depart the residence with her daughter.

6

search team by guiding them to some business records in his garage. When the search was completed, an agent asked if he would be willing to unlock the doors at Trio Medical Solutions so they could execute another warrant at that location. Evans agreed, and he followed the agents to Trio in his own car. During that search the agents again informed Evans that he was free to leave, but he elected to remain. He made a phone call and briefly spoke with his son. After the search was finished, he locked up the business and went on his way.

While Mrs. Evans was more emotional than her husband, she did not appear to be confused, disoriented, or ill during her interview, which lasted from an hour to an hour and a half. Whenever she teared up, the agents paused and allowed her to collect herself before proceeding with the interview. The agents never raised their voices or attempted to pressure her in any way. When the interview was over, Mrs. Evans stated that she needed to take her daughter to camp. In accordance with investigative protocol, Agent Gillum escorted Mrs. Evans upstairs to a bathroom and remained with her as she changed out of her night clothes. Shortly thereafter, Mrs. Evans and her daughter left the house.

The testimony of the agents, which was entirely credible, was not rebutted by any contrary testimony or evidence offered by the defendants. That testimony supports but one conclusion: that the agents employed no coercive tactics whatsoever either prior to or during the interviews and, thus, that the defendants' statements to the agents were entirely voluntary. The record is bereft of any evidence that the agents tried to subvert the defendants' will or pry out a confession. At no point did the agents employ or threaten to use violence or physical force, promise any benefits in an effort to induce defendants to speak when they were otherwise not inclined to do so, browbeat or intimidate defendants, subject them to an exhaustingly long interrogation,[5] or use some other technique to extract a confession. Absent such police misconduct -- which defendants have not even alleged, must less proven -- there can be no finding of involuntariness. *Connelly*, 479 U.S. at 165 (the law requires an "essential link between coercive activity of the State, on the one hand,

---

[5] *See Berghuis v. Thompkins*, ___U.S. ___, 130 S. Ct. 2250, 2263 (2010) ("there is no authority for the proposition that [a 3-hour] interrogation . . . is inherently coercive.")

and a resulting confession by a defendant, on the other.").[6]

There is no evidence whatsoever to support defendants' contention that their statements were coerced. Their *Jackson-Denno* motions (docs. 34 & 41) should therefore be **DENIED**.

**SO REPORTED AND RECOMMENDED** this __30th__ day of July, 2014.

*/s/ G.R. Smith*
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[6] Defendants also claim that they were not given the advice and warnings required under *Miranda v. Arizona*, 384 U.S. 436 (1966). (Doc. 34.) *Miranda's* "extraordinary safeguard," however, applies only to "custodial interrogations." *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984); *California v. Beheler*, 463 U.S. 1121, 1124 (1983). A suspect is "in custody" for purposes of *Miranda* only where "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Here, agents assured the defendants that they were not under arrest and never restrained them in any way. Even though the agents were entitled to detain defendants while the search proceeded, *Michigan v. Summers*, 452 U.S. 692 (1981), they elected not to do so and instead advised defendants that they were free to leave if they wished. Given these uncontested facts, the defendants were never "in custody," so *Miranda* warnings were unnecessary.